310-084-8 Douglas and Crystal Schwaab v. Jerry Sarantello v. Thomas Harding v. Thomas O'Neill Mr. O'Neill Your honors, good morning. May it please the court. Counsel, good morning. My name is Tom O'Neill and I represent Tom Harding, the appellant in the case of Schaub v. Harding from Peoria County. Trial court's judgment for Crystal Schwaab in the amount of $30,000 on a claim of intentional infliction of emotional distress must be reversed. The court's no-contact permanent injunction against Tom Harding must be reversed, and here's why. The Schaubs trespassed on Tom Harding's property for months on end while they were building their new home. Tom laid down some barbed wire out in the country where these properties were located, between his property and the Schaubs'. After the new house was built, Tom drove by the Schaubs' house while he was on his own property on a windage easement that's shown at 829 of the appendix. He stopped, and the evidence was he stopped and he stared at the house on a hundred occasions for five minutes at a time. He said nothing. He did nothing. He made no threats by act, noise, or gesture. These are the only acts that Crystal Schwaab saw Tom Harding engage in. These facts are so overwhelming on the intentional infliction of severe emotional distress that this court must reverse the trial court's judgment and the verdict entered by the jury. As to the injunction, the Schaubs themselves testified that all of Tom Harding's supposed offensive conduct stopped after Mr. Saratella called the then-attorney for Tom Harding, Bob Potts. It stopped and it never happened again. That was their own testimony. The court erroneously entered an injunction order for conduct that was no longer occurring and had never occurred. Let me follow up on a couple of these points. For Tom Harding to be guilty of intentional inflection of emotional distress, he must have engaged in outrageous conduct. He must have intended or known with certainty that his conduct was going to cause Crystal Schwaab severe emotional distress and that his conduct in fact caused that severe emotional distress. Well, there wasn't any outrageous conduct here. There wasn't any intent and there was no certainty that it would. What was the intent, do you suppose, of a fellow going out there, a house with a woman in it alone out in the country, and going out there and staring at the house? What do you reckon his intent was? Well, the intent was to, if nothing else, Your Honor, engage in a silent protest of somebody that had been hundreds of times trespassing on property that they knew they should not have been trespassing on. That is all he did. It would be as though you or I, if we wanted to express our disapproval of some conduct that a neighbor or some proprietorship in Ottawa or Peoria or Joliet, if we wanted to express our disapproval of it, we could stand in a place where we're entitled to stand and look at that proprietorship or that person. In any event, Your Honor, that is not outrageous conduct. But does it change the fact that we're not in a more urban setting or suburban setting where there are people, helpers around there, as opposed to doing something like this out in the country where help is kind of far away? Does that change what's happening? Does that change it? Well, if there were something other than stopping and looking at a house, perhaps. Facts matter. And we all understand that. We all know that. But what are the facts here? The facts, the admitted facts from Mrs. Schaub was she had never spoken to Tom Harden. She had never seen some of the other incidents that the jury found didn't happen about these alleged gun incidents. Didn't happen. And if that's the case, all we have is somebody, if it's, and with respect, Your Honor, it shouldn't matter if some person is engaging in legitimate conduct on his own property. It shouldn't matter whether it's in the backyard of my house in Peoria or out in the middle of some 40-acre field in Hancock County. Proper conduct that is perhaps disturbing or annoying does not raise to the level of outrageous conduct. The closest example we have in the courts of Illinois is the Schiller v. Mitchell case. Now, that's not out in the country. That is certain. And if that is a distinction that makes a difference between outrageous conduct and not, then you'll have to affirm. That is a fine read on which to hang an affirmance. But what happened in Schiller v. Mitchell is strikingly similar to what happened here. The second district said, look at it. The defendants are standing there on the property line. They have a surveillance camera on the plaintiff's house 24 hours a day. They engage in making complaints hundreds of times to the homeowners association, to the police. The plaintiffs are prosecuted. All of that happens. And the second district says, as a matter of law, on a 2615 motion, this is not a cause of action for outrageous conduct in the state of Illinois. It would be hard to understand that that result could be the law in Illinois. And the result of the trial court and the jury's verdict could be the law in Peoria County in this case. At best, that case is the law in the second district. It is. And as the court knows, sometimes I step on toes when I don't mean to. But I don't mean to suggest that the second district controls anything that this court or panel does in the third district. All I mean to say is that if that is the law in Illinois, under those kinds of facts, it would be difficult to square that result with what happened in Peoria County. I understand that in this case, you're the final arbiters of the law on this issue. It is persuasive indication, though, as to what the law might be, and I think probably is, the status of what it takes for outrageous conduct to exist. I mean, the trial court had the opportunity here at the motion for summary judgment stage and at the motion for directed verdict stage to say, yeah, you know, I've heard it all. I've seen it all. I've read it all. It just doesn't raise to the level of outrageous conduct. And we're suggesting to the court that that's what it is. But if I could, I'd like to move on and talk about the intent issue. You have to, as the court knows, you have to establish that Mr. Harding's conduct in this case, he was certain he was certain that this was going to cause not only distress, but that level of distress for which no reasonable person can stand up against. They cannot endure it. And how would he know that by standing on his property and looking at the house or or parking his car for five minutes at a time and making his silent protest, if you will? How would you know that? Particularly when he's never talked to Crystal Shaw. She doesn't know him. He doesn't know her. Where was Mr. Shaw when this was when these protests were going on? Well, the record is like he was there sometimes. I think this is a fair characterization. And if it isn't, Mr. Saratoga will correct me. My fair characterization of the record is he was there sometimes, but he wasn't there sometimes. In fact, the there's some question as to whether Mr. Harding even knew anybody was home when he was stopping, looking at the house. But, you know, all reasonable inferences in favor of the plaintiff here. You have to assume, OK, at least Crystal Shaw was there. But how would you know? How would how would Tom Hardy be certain that he was inflicting that level of distress that no reasonable person could withstand in civilized society? How do you know that? The only way under those circumstances that he would know it is if somebody told him. Well, who told him here? There were two incidences that taken all inferences in favor of the Crystal Shaw that occurred. One was when Duran Huseman came out and investigated the barbed wire incident. And what happened there? Boyd Roberts, the attorney for the shops, said, I'm going to take this thing into court. We'll get it resolved. That's in September of 2007, a year before this lawsuit is filed. They were going to file and resolve the issue. What did Tom Hardy do there? Barbed wire comes up. You never see barbed wire again, even though under the law he has the right to lay a division. That's an offense law and a common law. He has the right to do that. But he didn't. He stopped because of what? He knew there was an objection. He stopped. Second time. We have these incidents that are occurring from January of 08 through August of 08. No one is saying anything to him. Nobody is saying, don't do that. I'm upset. Can't you see what you're doing to my wife? Nada. Nothing happens there until Mr. Serratella, and this is the testimony of both of the shops, in their case in chief. Both of the shops say Jerry Serratella called Bob Potts. And once Bob Potts called in August of 2008, it never happened again. No offensive conduct of any type occurred from Tom Hardy. So what does that tell you about the intent issue? I would like to suggest to the court what it tells you is that if Tom Hardy knew that he was causing any level of distress that was going to create further issues, he stopped doing it. And that's what the record shows. Even when you take all inferences in favor of the plaintiff here. Now, the third issue, and that is on the intentional infliction of emotional distress. The third issue is was there severe emotional distress here? And this is the problem with the intentional infliction of severe emotional distress. You see it in the quotation of the draft of the restatement third on intentional infliction of emotional distress that talks about the evanescent nature of what emotional distress is and why there should be. And I don't mean to suggest that restatement third is the law in Illinois. I mean to suggest that it is indicative of where the trend of modern law in our civil civilized society is heading. And that is that the courts have a special duty to examine those facts to determine whether the kind of conduct being complained of is such is more than just distressing or the slight insults or or infirmities of politeness in an ordered society such as our country. If it's more than that, then the court has to be the gatekeeper before the case ever gets to the jury. Now, to the point of intentional infliction of severe emotional distress. Counsel has two minutes. Thank you. If and I invite you to take a look at the con case. And if I could, I have to use my notes here. Just a moment. The con case talks about a plaintiff who the plaintiff who was suffering from nightmares about being arrested and he's having insomnia. No, no severe emotional distress in that case. In another case, the plaintiff will be was very upset. He was very nervous. He was very depressed. Even in this is the night that case in the night that case, even with a doctor's clinical finding of moderate or worse depression, no severe emotional distress. Johnson versus Kmart feelings of stress, just like in this case, or distrust caused by an employer's hiring a detective to look into the plane's private life, not severe emotional distress. What we have here. Crystal shops. My home testimony. Your distress consisted of being stressed out. Stomach aches. Headaches. Insomnia. Missed work. But by her own testimony, she didn't lose her job or lose any opportunity for a promotion for promotion. She didn't consult a physician. She did not consult a physician. And her distress did not prevent her from engaging in any other normal daily activities. None of that happened. I would suggest to the court that when you when you compare these facts with con NYSEC Johnson, there just is not showing a severe emotional distress. Now, quickly, as to the injunction issue, I'm going to suggest to the court that certainly I want to apologize to the court. I should. I didn't put a case that cites the elements of a permanent injunction. That was my oversight. Don't hold it against my client. I got too quick when I wrote the brief. But the issue was is the issue that is that's defective here is what right should be protected? Certainly a right to be to be safe in your own home. That's the right everybody gets. But did it need to be protected here? And that's the point. It had already been protected. That is the point. The protection was when Mr. Serrata said stop. And it stopped. There was nothing left to protect at that point because there was no more offensive conduct. Thank you very much. If you have any questions, I'm happy to answer them. Thank you, Mr. O'Neill. Thank you. Mr. Serrata. Good morning, Justice. Good morning. I would just briefly like to address a couple of points that Mr. O'Neill raised. First of all, on the barbed wire situation, he didn't simply put barbed wire down between on his property. The evidence was that he put barbed wire down on my client's evidence also. And the jurors chose to believe my clients that he put barbed wire down on their property also. Another point, Mr. O'Neill said that nothing was being done to imply that, well, if there was all this aggravation, why didn't my clients try to do anything? The record shows that my client continually attempted to pay Mr. O'Neill's client $30,000 to buy him off so he would stop this situation. And Mr. O'Neill's client continually refused the offer of $30,000 for an easement on the property. So my client did do something. Well, he had no – Mr. O'Neill's client had no duty to sell an easement to your client. No, no, but he's implying that my clients didn't do anything to protest the actions of his client. He then goes on to say that how would Mr. Harding know he was inflicting mental distress? Well, he knew he was trying to drive these people from their home. And if you're trying to drive somebody from their home, I think that's a pretty good clue that you're doing something pretty bad. Is it that he was trying to drive them from their home or keep them off of his own property? Well, if he was trying to keep them off of his own property, he would have showed Tom the documents he had to prove that my client didn't have an easement or he would have filed a lawsuit. A long time – years before when my client started using the property, the road, he never did that. He never filed his lawsuit until we filed our lawsuit. So I don't think he was trying to keep the people off his road. What he was trying to do was drive them out of their home. He wanted them not to live back there because he felt that this was his land, even though my client had lawfully purchased the land. Let me ask you this. At the time that the defendant was parking on his property or walking on his property and staring at your client's home, was your client's trespass still going on at that time? No. Wait, wait. I'm sorry. Yes. Yes. They still were using the road up until, well, we hired a lawyer to examine the situation. He told my client he, in fact, didn't have an easement. My client immediately stopped using the road, offered him a green order saying my client would never use the road again. Another point I want to make out is that Mr. O'Neill just talks about the drive-by and the parking. But the whole – his client had a plan. And the plan started out with his client first of all coming to my client's property and having a gun in the back of his truck within arm's length and ranting and ranting at my client and scaring the heck out of my client for five minutes. And then two more rants when Mr. Harding had a gun in his truck. But if he wanted to inflict extreme emotional distress upon Mrs. Schaub and she was there, why didn't he do those things to her? Well, he did it to both of them. The idea of Mr. Harding's plan was directed at both of them to drive them away from the property and get them to sell the property. Certainly, and the record shows that this is – my client testified to this, and so did Crystal, that Mrs. Schaub was told about the incidents with the gun by her husband. She was told about the incident with the electricity. She knew everything. And Mr. Harding, I think, reasonably knew that they communicated with each other about the actions of Mr. Harding. But if you really want to scare somebody and you really want to cause them emotional distress, why don't you go and have sort of a transfer of emotional distress? Why don't you go – I mean, wouldn't it be scarier to be confronted face-to-face rather than – Well, sometimes she was home and he was parking there, and sometimes Mr. Schaub was there. It was a plan that was developed against both of them, and it got to both of them. I mean, it was a very, very diabolical, complicated plan that this very smart man devised to issue a rain of terror on these people to force them from their home. So she was home alone many nights because Mr. Schaub worked, as is in the record, and he would show up at night when she was there alone. She had a loaded gun on her nightstand at all times because she didn't know what this man was going to do. Had he ever come up to their door or onto the property? The closest he got was 60 feet in front of their home on the road that this very, very out-of-the-way place in the country where they lived, and he would park 60 feet from their front door and continually drive by at all hours of the day and night. But as I said, you have to couple that with the gun incidents, with the barbed wire incidents. This was a whole plan that he put together, and if he was serious about, as I say, about his road, he would have filed a lawsuit when they first started using it three years earlier. My client, the record shows my client was using the road justice from the year 2004 for 2005, 2006, and he never made any objection at all. He didn't object to that until they started building the house, and that's when Mr. Harding... More vehicles, more predominant use. Well, there were some vehicles coming back to build the house, but that wasn't ever, ever in the record that he objected to that. Just that they were going to have a house. Absolutely. He just didn't want anybody living on what he considered to be his property. And that was established in the record? Yes, I believe it was. I'll tell you another thing that was established in the record by a special interrogatory that counsel put to the jury. The jury said yes, that Mr. Harding did have a gun and did have this confrontation with Mr. Schaub in July of 2007 and did do all that. But they said we're not going to find an assault charge against him because we don't believe Mr. Schaub was really scared enough for it to be an assault. So they believed, the jury believed that Mr. Harding had confronted my client with the gun in the back of the truck and that that actually occurred. And, of course, that's one of the basis of our situation is that's when Mr. Harding established that I'm a crazy person. I've got a gun. You don't know if I'm going to kill you. You don't know what I'm going to do, but I'm going to do something. And as far as the injunction goes, two separate judges heard the evidence, saw him testify, saw my client testify and said we're taking your guns away from you. You're not going to have any guns while this is going on. And even afterwards, you're not going to have any guns because we're concerned enough about you that we don't want you having any guns. So, you know, he did what he hoped he would do. He drove a wedge between them. He caused a lot of marital strife between them. He caused a number of problems. I have that in the record. It was testified to. And it was a very, very clever plan by a man who was very smart. He teaches mathematics and physics in college. I guess he's retired now, but he's a very smart man. And he did what he did. And all I can say is it terrified my clients and caused Crystal to have a lot of problems. And although it's not in the record, of course, they're divorced now. So that's not part of the record. That happened just recently. But they're divorced, so he got halfway home. Anyway, if you justices have any further questions, I try to answer them. I try to put everything in the brief that I had to say. I think I pretty much addressed everything. The only other thing I'd like to say is this. The camera case that Mr. O'Neill talked about, that's very different if you have a camera facing your house than a man who rides around in a truck with a gun in the back of him because the camera can't shoot you. But the guy in the truck with the gun in the back can shoot you. So to me, that's a big, big distinction. Having a camera pointed at your house is not nearly as frightening as having a man 60 feet from your front door with a gun in the back of his truck who's already committed an assault against you. So I think that case is clearly distinguishable from this case. Just out of curiosity, and this will also be on the record, so I apologize. Who's living in the house now? Just Mr. Schott. Okay. All right. Thank you, Mr. Schott. Thank you very much, Justice. Mr. O'Neill, some rebuttal? Thank you, Your Honor. Thank you, Counsel. You can read Mark Twain's autobiography on the Internet. And just like Yogi Berra said, or I think it was Casey Stengel, you can look it up, Twain said that as a young man, and this is a paraphrase, he could remember, his memory was so good he could remember things that didn't even happen. That's kind of what you've heard in part here, and I want to highlight that. That special interrogatory, I'm going to ask the court to go back and take a look, and I apologize to the court for not having the citation page. I think it was like 870. It's in the 800s in the common law record. It was an interrogatory with five questions as to the assault charge, and there was only one count, not two, that went to the jury. Judge Corey said you don't have enough evidence as to any other supposed incident with a gun except one. And as to that, those five elements, and those five elements came from this court's decision of an assault case, the Bowker case. Of those five elements, only the first one did the jury say yes, that happened. And that was, did Tom Harding make an offer of the use of force against Doug Shaw? The next one down is, did he have the ability to engage in conduct that would cause that offer of force to actually occur? No. What do you make of that, Your Honors? Well, isn't that issue really kind of moved in the sense that your client wasn't found guilty of the assault? Absolutely right. But what we have, what you just heard here is this isn't about a camera versus a, this is, you know, a camera can't shoot, you just heard it. A camera can't shoot somebody. A gun can. But the jury didn't ever find that anybody ever had a gun. It didn't happen. And that's what the jury says when they say no to that second element, using the Bowker five elements for assault. It didn't happen. The, the, let me go down through the list of things I made here. The, the bar, the contingent is that the bar wire was laid on the Shaw's property. Again, I'll invite the court to go back and look at the testimony of Douglas Shaw. His testimony was that he had the property surveyed and that part of that barbed wire was over on his property a few inches, maybe a foot or two. You know, even the cold record, you can see from that, that there was an attempt to lay out a barbed wire line along the property line. And that's what the record suggests. The $30,000 offer, again, the record is very clear. The Shaw's own lawyer, Boyd Roberts, testified. Yeah, we talked about that, but I'm not, I'm not sure there was any offer made. The evidence was that there was some discussion about a $30,000 offer, but Doug, Doug Shaw said, I got to go talk with my lawyer about that. He talked to him. There was never an offer made at $30,000. But what happened here is the jury just latched on to a number, decided they were going to do something with that $30,000. But it didn't have anything to do with intentional infliction of emotional distress because there was not. There was not such distress that no reasonable person could withstand it. The. Also, Mr. Serato suggests that the shots never saw any documents that proved that they were trespassing. Well, what do you do with the evidence of Durant? He's been the deputy that says he came out. Tom Harding showed me all of his papers. And after I looked at those papers, I went over and I talked to that shop and I said, looks, that officer, Huseman says, looks to me like you're trespassing. And here are the papers. What do you do with that? I guess we're fly specking the inference of that conversation that officer Huseman told him about those documents, but he never showed them to him. Does that make a difference? I'd suggest the court. It does not make a difference. The trust, the trespass was the trespasses occurred here all the way through November of 2008. They only stopped when when a court order was entered, permanently enjoying the shots from using this property. So what did they do? They built a road to the east on property that they owned. And that's on a twenty nine. You can take a look at it. After that, there was no further conduct. No, no, no. Don Brooks or any kind of controversy between the parties. That's what could have happened right out of the chute. In this case, if they had just done that and they had every ability to do that. I'm sorry. Let me interrupt you. So after the shops built the road on their own, put trespassing by their admission, they were trespassing after they put trespassing. Was there were there any more of these incidents where your client was driving out and parking and staring at the house? The record is clear. There were not. And that is by the testimony of both of the shops themselves. Is this also after the discussion? Was it the same discussion that Sertella had? Let me give you. I'm sorry. Mr. Sertell had with with the with your clients. Right. And let me give you the chronology so that we can. This is a record. I apologize. I don't have page sites to it. The conversation, the shots come in and talk to Mr. Sertell. Mr. Sertell calls Attorney Potts. That happened in August of 2008. Within a couple of weeks thereafter, the current lawsuit is filed. There is a temporary injunction hearing that occurs. Judge Warren entered an order. We filed a counterclaim saying that trespass is occurring and asking for a permanent injunction. By November of 2008, the court entered an order saying, yes, you're trespassing. That's when the road was built. And so after August of 2008, nothing. There's no issues between any of the parties here. And also after November of 2008, no issues. Peaceable. That's what happened. Those are the facts. I have other than I have other comments, but I'm out of time. Thank you very much. Thank you, Mr. O'Neill. Mr. Sertell. Thank you both for your arguments here this morning. The matter will be taken under advisement. A written disposition will be issued. And this court in a brief...